**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
ROBIN WARNER, D.O.,

Case No. 22-10400

                    Plaintiff,

**COMPLAINT**

    - against -

**PLAINTIFF DEMANDS**
**A TRIAL BY JURY**

HOSPITAL FOR SPECIAL SURGERY
AMBULATORY SURGERY CENTER
OF MANHATTAN, LLC,

and

LOUIS A. SHAPIRO, CEO AND PRESIDENT,
*in his individual and official capacities*,

and

DR. DALE LANGE, M.D., *in his professional*
*and individual capacities*,
                                        Defendants.
-------------------------------------------------------X

        Plaintiff, ROBIN WARNER, D.O., by her attorneys, PHILLIPS & ASSOCIATES,

Attorneys at Law, PLLC, hereby complains of the Defendants, HOSPITAL FOR SPECIAL

SURGERY AMBULATORY SURGERY CENTER OF MANHATTAN, LLC, DR. DALE

LANGE, M.D., and LOUIS A. SHAPIRO ("Defendants"), upon information and belief, as

follows:

## NATURE OF THE CASE

        Plaintiff is a distinguished, well-credentialed, board-certified Neurologist, licensed to

practice in New York. Plaintiff's medical training began at NYIT College of Osteopathic

Medicine. After graduating from medical school, Plaintiff completed an Internship in Internal

Medicine at Albany Medical Center and did her Residency in Neurology at Albany Medical

Center. Plaintiff was also selected to pursue a specialized, competitive fellowship program at the Hospital for Special Surgery in Manhattan. Plaintiff completed her first-year fellowship and was selected to pursue specialized training as a second-year fellow.

Yet, after informing her supervisors at the Hospital of Special Surgery, Dr. Dale Lange, and Dr. Dora Leung, that she was pregnant, Plaintiff's prestigious medical training and career prospects unraveled. In March 2020, as the COVID-19 pandemic exploded, Plaintiff's request for a modified work schedule that would allow her to competently carry out her duties while simultaneously protecting herself and the health of her pregnancy, was denied. Plaintiff's request was in line with the Hospital's and the State of New York's COVID-19 directives and mandates. Far from creating an undue burden, Plaintiff's request was also required by law.

Defendants' conduct that ensued, because of her pregnancy and request for a reasonable accommodation, included but is not limited to, a campaign of harassment, forced leave, workplace exclusion, withholding of her diploma, accusations of misconduct, and interference with job prospects and offers. Plaintiff made many complaints detailing the discriminatory action taken against her, including by sending a letter directly to the Hospital's President and CEO, Louis Shapiro, providing full knowledge of her allegations. Plaintiff is unaware of any investigation occurring at any point in time, but she knows that no corrective action was taken. In fact, Defendants doubled down on their retaliation, when within 10 days of Plaintiff's filing an EEOC Charge of Discrimination, Defendants opened additional investigations into nearly every research project in which Plaintiff had been involved during her two years at the hospital. More than two years after graduating, the Hospital of Special Surgery continues to withhold Plaintiff's diploma. Due to Defendants' discrimination and retaliation, Plaintiff's career has been irreparably derailed. Plaintiff also suffers severe emotional distress from the severe harassment and illegal treatment

and continues to suffer significant financial harm in the form of lost economic and career advancement opportunities.

Plaintiff brings this lawsuit pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Pregnancy Discrimination Act of 1978, 42 U.S.C. §§ 2000e(k) (the "PDA"), the New York State Human Rights Law, New York State Executive Law §§ 296 *et seq.* ("NYSHRL"), the New York City Human Rights Law, New York City Administrative Code §§ 8-502(a) *et seq.*, ("NYCHRL"), and the New York Common Law and seeks damages to redress the injuries she has suffered as a result of being discriminated and retaliated against on the basis of her pregnancy.

## JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

1. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 42 U.S.C. §2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343.

2. This Court has supplemental jurisdiction over Plaintiff's claims under the NYSHRL, the NYCHRL, and the New York Common Law pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as the acts complained of occurred within the Southern District of New York.

4. By: (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 2, 2021, (b) receiving a Notice of Right to Sue from the EEOC on July 13, 2022, (c) commencing this action within the period allowed by the parties' tolling agreement of the EEOC's 90-day deadline, and (d) contemporaneously with the filing of this Complaint, mailing copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the New York City Administrative Code, Plaintiff has satisfied all of the procedural prerequisites for the commencement of

the instant action. A copy of the Notice of Right to Sue is annexed hereto as **"Exhibit A";** a copy of the transmittal letter to the NYCCHR *et ano.* is annexed hereto as **"Exhibit B."**

5.    The parties entered into a tolling agreement for mediation purposes on October 3, 2022, which remained in effect through December 7, 2022. The 90-day deadline for the filing of this complaint after the issuance of the Notice of Right to Sue by the EEOC was therefore extended by 66 days.

## PARTIES

6.    Plaintiff is a resident of the State of New York, New York County.

7.    Plaintiff is a 35-year-old woman.

8.    Defendant HOSPITAL FOR SPECIAL SURGERY AMBULATORY SURGERY CENTER OF MANHATTAN, LLC ("Hospital for Special Surgery") is a domestic not-for-profit corporation licensed to do business in the State of New York.

9.    Defendant Hospital for Special Surgery is an integrated healthcare system specializing in elective orthopedic surgery and encompasses over twenty hospitals, ambulatory centers, and rehabilitation facilities in the New York City Metropolitan area.

10.   Plaintiff's work location was HOSPITAL FOR SPECIAL SURGERY's Belaire facility, located at 525 E. 71st Street, New York, NY 10021.

11.   Defendant HOSPITAL FOR SPECIAL SURGERY employs at least fifteen (15) or more employees.

12.   Defendant HOSPITAL FOR SPECIAL SURGERY was an "employer" within the meaning of the Title VII, PDA, NYSHRL, and NYCHRL.

13.   At all times relevant, Plaintiff was an employee of Defendant HOSPITAL FOR SPECIAL SURGERY.

14. At all times relevant, Defendant Dr. Dale Lange, M.D., was the Chairman of Neurology ("Dr. Lange") at the Hospital for Special Surgery.

15. Defendant Louis A. Shapiro is the President and CEO ("Shapiro") at the Hospital for Special Surgery.

16. Dr. Dora Leung, M.D., is the Fellowship Director, Neuromuscular Medicine ("Dr. Leung") at the Hospital for Special Surgery.

17. Throughout her employment with Hospital for Special Surgery, Plaintiff reported directly to Dr. Lange and Dr. Leung.

18. Defendant Dr. Lange had the authority to hire, fire and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decisionmaker of the same.

19. Dr. Leung also had the authority to hire, fire and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decisionmaker of the same.

20. Defendant Shapiro had the authority to hire, fire and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decisionmaker of the same.

21. Defendant Shapiro oversaw Hospital of Special Surgery's operations, including but not limited to, developing, and implementing all policies and procedures, including antidiscrimination and COVID-19 policies.

## **MATERIAL FACTS**

**Background**

22. In order to become a licensed physician, an individual must graduate from medical school, pass the United States Medical Licensing Examination, and complete a residency.

23. Specialists, who have specific expertise in a particular field of medicine, often undertake a fellowship following their residency to gain expertise through study, research, and clinical practice.

24. Medical fellowships are prestigious positions reserved only for the top doctoral candidates.

25. Given their competitive nature, a medical school graduate who completes a fellowship has achieved the highest possible distinction in their specialty area.

26. In neuromuscular medicine, which is the field dealing with peripheral neurological conditions, it is standard practice for specialists to undergo a fellowship to ensure they have hands-on-practice treating patients.

27. Out of a large pool of candidates, Plaintiff was selected for the highly selective Neuromuscular Medicine Fellowship at Hospital for Special Surgery.

28. Upon information and belief, as of 2019, there were only 67 neuromuscular fellowship positions in the United States, ensuring that fellows like Plaintiff are top candidates for post-fellowship academic and clinical positions.

29. Plaintiff began her fellowship at Hospital of Special Surgery in July of 2018. She earned approximately $90,257.78 annually as a fellow.

30. At Hospital for Special Surgery, Plaintiff received clinical training, evaluated patients with neuromuscular conditions, and engaged in an independent research project.

31. As a Fellow is akin to a student or trainee, Dr. Lange and Dr. Leung were responsible for providing Plaintiff with feedback, guidance, and direction to further her clinical and research skills.

32. In Plaintiff's first year of her fellowship, Dr. Leung met with Plaintiff for quarterly meetings to discuss her performance. Plaintiff frequently scored "Exceeds Expectations" and "Meets Expectations."

33. Plaintiff completed her first year of her fellowship without incident and received an Accreditation Council for Graduate Medical Education ("ACGME") accredited diploma.

34. After receiving her ACGME diploma, in July 2019, Hospital for Special Surgery hired Plaintiff as a second-year Advanced Neuromuscular Medicine fellow.

35. As an Advanced Neuromuscular Fellow, Plaintiff continued to treat patients with neuromuscular conditions and engaged in research of neurological and neuromuscular manifestations in COVID-19 patients.

36. Given that Plaintiff had already completed her ACGME fellowship requirements, Plaintiff was not required to do a second-year fellowship but did so anyway, motivated by her desire to further her clinical and research skills.

37. Plaintiff's direct supervisors were Dr. Lange and Dr. Leung.

38. Dr. Leung reported to Dr. Lange and her decision-making on substantive or personnel issues was at the behest of Dr. Lange's instruction or with his approval.

**Pregnancy Discrimination, Harassment, and Failure to Accommodate**

39. Halfway through her 2nd year fellowship, in early January 2020, Plaintiff learned she was pregnant. After having had difficulty conceiving, she was ecstatic.

40. Around the same time, Plaintiff became ill with flu-like symptoms that were so severe she went to the Emergency Room. Experiencing respiratory distress, she was observed and treated in the Emergency Room overnight.

41. Plaintiff was discharged the next day with prescription medication and a referral to a pulmonologist.

42. Plaintiff provided Dr. Leung with documentation detailing her Emergency Room hospital stay.

43. In early March 2020, just as the pandemic was erupting in New York, Plaintiff informed Dr. Lange and Dr. Leung that she was pregnant.

44. Plaintiff also told her supervisors of her concern about the threat of exposure to COVID-19, given her pregnancy and recent respiratory illness.

45. On March 18, 2020, New York Governor Andrew Cuomo issued Executive Order 292.6 ordering all non-essential business to cease operations and **"to utilize, to the maximum extent possible, any telecommuting or work from home procedure…"**

46. Because the vast majority of Hospital for Special Surgery's patients were seeking non-emergency, elective surgeries, the hospital qualified as a non-essential business. The hospital canceled all medical appointments and saw a very limited number of patients on an emergency basis only.

47. The next day, Plaintiff requested to work remotely given the lack of on-site work. By way of explanation, Plaintiff wrote in her email to Dr. Leung: **"There are no patients scheduled today. I am faced with the dilemma of having to put myself and my family at risk by leaving the house and going into the hospital…The rest of my work will be on writing papers which I can do remotely."**

48. Plaintiff went on to say that if there were **"a consult or other need for a fellow**… [she was] **a 15 minute walk or 5 minute cab from the hospital and would come in right away (same as on home call)."**

49. Dr. Leung denied Plaintiff's pregnancy-related accommodation request and did not propose any alternative accommodations.

50. In a reply email, Dr. Leung diminished Plaintiff's concerns saying: "**Regarding your offer to only come in when there are patients to see, I also fail to see how that would decrease your exposure if your goal is to stay home.**"

51. Dr. Leung also stated, **"We have been advised by the CDC, as well as experts in infectious disease, that at this time, there is no known addition risk from the virus in any trimester."**

52. Still justifiably fearful, Dr. Warner emailed back at 9:48 pm, pushing back on Leung's assertion regarding pregnancy that "there is no known addition [sic] risk from the virus in any trimester." Dr. Warner explained her health status further, points out that CDC does not have enough data to make determinations at this early state, but has warned: **"Based on long experience with other respiratory illnesses…the Centers for Disease Control and Prevention warns that contracting the coronavirus while pregnant could make you more vulnerable to severe respiratory problems…Facilities may want to at least consider limited exposure of pregnant personnel."** https://www.propublica.org/article/coronavirus-and-pregnancy-expecting-mothers-q-and-a

53. Dr. Leung remained unsympathetic.  Moreover, her denial was at odds with the hospital's general COVID-19 policy as Shapiro sent a company-wide email on March 14 that said, **"[Hospital for Special Surgery] implemented a System-wide Work From Home (WFH) policy, which at the discretion of your direct supervisor(s), you are encouraged to do whenever possible,"** as at least ten hospital employees had been exposed to COVID-19.

54. Dr. Leung emailed Plaintiff: "**Going forward, if you are still concerned about coming to work in the current situation, then you can take your personal and sick days until they**

9

**are used up. After that you will have to take unpaid leave and temporary leave of absence from the program."**

55.   Plaintiff was upset and confused. Prior to Plaintiff's pregnancy, she had regularly been permitted to be on-call at home on weekends. Moreover, her request was in line with the Governor's mandate to work from home when possible.

56.   Plaintiff felt the denial was punitive and retaliatory for her pregnancy accommodation request.

57.   Plaintiff's request was workable, reasonable, and not an undue burden for the hospital.

58.   Feeling frantic and desperate about being forced to choose between her job and the health of her pregnancy, Plaintiff continued to protest the denial of her accommodation request.

59.   In response, on or about March 20, 2020, Dr. Leung called Plaintiff in for a meeting with herself and Laura Robbins, DSW ("Robbins"), Designated Institutional Official for Graduate Medical Education.

60.   At the meeting, Plaintiff reiterated her request for an adjusted schedule accommodation: work-from-home and perform clinical duties on an on-call basis.

61.   Dr. Leung again denied Plaintiff's accommodation request and told her, in sum and substance, that **her accommodation request "makes no sense"** as she could still be exposed to the virus if she responded to a consult.

62.   Plaintiff explained that the accommodation would reduce her exposure as much as possible, especially as the virus spreads primarily through person-to-person contact, and at least eleven Hospital for Special Surgery staff members had already tested positive for COVD-19.

63.   Dr. Leung did not change her mind and Robbins did not intervene.

64. Later that day, Dr. Leung emailed Plaintiff stating: "**it is probably safest to stop clinical activity and take time off,**" meaning Plaintiff would need to take unpaid leave if she persisted in advocating for an accommodation request.

65. Simultaneously, Dr. Leung threatened that if Plaintiff took unpaid leave, **"we do not know how it may affect the rest of your training, and that would have to be sort[ed] out once things calm down."**

66. Plaintiff was shaken. She felt forced to continue working despite the risks, as it was made clear from Dr. Leung that taking unpaid leave could hinder her ability to graduate and derail her post-fellowship employment.

67. However, without explanation, the next day, Dr. Leung instituted an alternating schedule for Plaintiff and her co-fellow Dr. Jeffrey Schachter ("Dr. Schachter"). The schedule called for one fellow to come in two days a week, while the other would work three days a week, and the reverse on alternate weeks. On off-site days, the fellow could engage in remote research, reading and writing.

68. On or about March 27, 2020, Dr. Lange emailed the fellows to inform them that they no longer needed to be on-site, unless they had scheduled consultations.

69. Plaintiff was relieved about the sudden reversal. Yet she was perplexed about why a week prior she had been berated for requesting a work-from-home accommodation and had been told that it was not feasible.

70. In early April 2020, Hospital for Special Surgery announced that it was establishing dedicated COVID-19 units.

71. Following this announcement, Dr. Leung stopped Plaintiff in the hallway and said, in sum and substance: **"Good news, Dr. Warner, the Hospital will not require pregnant women**

**to be deployed to a COVID-19 unit.**" Dr. Leung went on to say that there would be an influx of non-COVID-19 neurological patients for her and Dr. Schachter to consult.

72.  Given the brevity of the conversation and the lack of a formal written policy regarding the issue, both Plaintiff and Dr. Schachter mistakenly believed that Dr. Leung was informing them that pregnant women would not be required to treat COVID-19 patients.

73.  In compliance with what they understood the directive to be, Plaintiff and Dr. Schachter agreed that both fellows would see non-COVID-19 patients, however only Dr. Schachter would see COVID-19 patients. In order to ensure the workload was split equally, Plaintiff would see additional non-COVID-19 patients.

74.  For several weeks, Plaintiff confirmed with the on-duty attending physicians, Dr. Teena Shetty ("Dr. Shetty") and Dr. Brion Reichler ("Dr. Reichler") that her scheduled patients had tested negative for COVID-19.

75.  Then, on or about Saturday, April 25, 2020, Dr. Erin Manning, Plaintiff's supervising Attending Physician ("Dr. Manning"), texted Plaintiff that she must attend a consult for a patient that had tested positive for COVID-19 and whose hospital bed was in a dedicated isolation unit for COVID-19 patients.

76.  Dr. Manning had the authority to affect the terms and conditions of Plaintiff's employment or to otherwise influence the decisionmaker of the same.

77.  Plaintiff texted Dr. Manning: **"I was told by administration I am not seeing any COVID+ patients. This is a change in policy."**

78.  Dr. Manning alleged that she was unaware of Plaintiff's accommodation or a COVID-19 policy for pregnant women.

79. When Plaintiff would not see the COVID-19 patient, Dr. Manning removed her from the call schedule for the entire weekend.

80. Plaintiff protested the retaliation, emailing Dr. Leung: "**Dr. Manning is changing the schedule for tomorrow against my wishes. I stated I will work. I should not be forced to use my vacation time against my will when I am willing and able to work.**"

81. Despite Plaintiff's complaints of retaliation and willingness to work with any non-Covid-19 patients, Dr. Leung docked her two vacation days, claiming she was refusing to work that day and had refused to treat a patient who needed an urgent consult.

82. Contrary to Dr. Leung's narrative, Plaintiff was informed by the nurse practitioner treating the patient was being seen for a non-emergency consult.

83. Furthermore, Dr. Leung forced Plaintiff to take a vacation day for Saturday, despite the fact, that Plaintiff had already been on-call for twelve hours that day and had spoken with patients about their treatment plans.

84. Despite Plaintiff's request to work on Sunday, Dr. Leung insisted on taking away her vacation day and said, "**I agree you should therefore be taken off call for this weekend.**"

85. Following the incident, Plaintiff apologized to Dr. Schachter via text and explained that she had believed that they were following Dr. Leung's directives.

86. Dr. Schachter replied via text: "**I had thought that either they would save the covid patients for my days or if truly urgent and couldn't wait (i.e., almost nothing) the attending [physician] would just see them…**"

87. On or about April 25, 2020, Plaintiff emailed Bruce Slawitsky, Senior Vice President of Human Resources and Service Excellence, ("Slawitsky") seeking clarification on whether pregnant employees were seeing COVID-19 patients.

88.   In her email, Plaintiff said: "**The terms I am being asked to consider are unpaid leave unless I see all patients, even if puts the health of myself and [my] unborn child at risk. Not to mention the financial implications of unpaid leave on my growing family.**"

89.   Slawitsky called Plaintiff and told her that Hospital for Special Surgery policy dictated that pregnant women should not be treating COVID-19 patients, and that he was not aware of any exceptions to the policy.

90.   Slawitsky promised to investigate Plaintiff's situation.

91.   On or about April 27, 2020, Plaintiff met again with Dr. Leung and Robbins.

92.   Dr. Leung informed Plaintiff that pregnant fellows would not be deployed to COVID units, however they would still have to see COVID-19 patients inside these units on occasion.

93.   Dr. Leung told Plaintiff she would have to enter COVID-19 units and consult COVID-19 patients, otherwise she should exhaust her paid leave and eventually go on unpaid leave.

94.   Plaintiff complained that Defendants' actions were illegal under the New York City Human Rights Law, as she was being forced to take leave due to a failure to accommodate.

95.   Robbins responded, in sum and substance, that it **"was uncollegial to bring up the law,"** and further, that **"the law does not apply, yet they had to oblige."**

96.   Later that day, Plaintiff sent another email requesting an accommodation to be assigned only non-COVID-19 patients and noted, "**I am fully willing and able to treat all other patients in the hospital in consultation, which represents the majority of our consults.**"

97.   In a stunning act of gaslighting, Dr. Leung wrote to Plaintiff as if her request was new, saying, "**If you had communicated your continued concerns about seeing Covid patients prior to this, it would be possible that we could have arrived at a more equitable arrangement, to everyone's satisfaction.**"

98. Plaintiff's accommodation requests were workable, reasonable and would not have posed an undue hardship, as only seven out of forty-eight of the consults assigned to the fellows between March 18, 2020, and July 7, 2020 were COVID-19 patients.

99. Instead of granting her pregnancy accommodation request as required by law, Plaintiff endured weeks of harassment, anxiety, and stress.

**Retaliation: Exclusion and Ongoing Harassment**

100. In the ensuing weeks, the retaliation related to Plaintiff's accommodation requests ratcheted up.

101. For instance, in or about May 2020, Dr. Lange resumed his weekly in-person research meetings, but excluded Plaintiff from them. Prior to informing Dr. Lange of her pregnancy and requesting an accommodation, Plaintiff had regularly attended these meetings.

102. Plaintiff only discovered that these meetings had resumed when she saw her colleagues leaving a meeting room together. Plaintiff's exclusion impeded her ability to further her research skills and her ability to network with the other medical personnel at Hospital for Special Surgery.

103. On or about May 15, 2020, Plaintiff presented her COVID-19 manuscript at a Grand Rounds lecture and several physicians, including Dr. Lange, praised her research.

104. Plaintiff's graduation from the Department of Neurology fellowship program occurred on June 20, 2020.

105. During the graduation speech and presentation that day, Dr. Leung falsely attributed Plaintiff's COVID-19 manuscript to her male colleague Dr. Schachter.

106. Plaintiff believed the false attribution was another intentional act of retaliation, as Plaintiff had emailed Dr. Leung a list of her academic achievements upon request, and Dr. Leung had attended Plaintiff's research presentation only one month prior.

107. On July 15, 2020, Plaintiff emailed Dr. Leung at approximately midnight to let her know that she was not feeling well and was experiencing muscle aches, headaches, and dry coughing.

108. Dr. Leung replied: **"Sounds like you should stay home and rest."**

109. That same day, Plaintiff was called by her obstetrician Dr. Michele Jean Haughton ("Dr. Haughton"), who diagnosed her with gestational diabetes. Plaintiff, then, immediately emailed Dr. Leung to notify her of this diagnosis.

110. On July 16, 2020, Plaintiff still felt ill. She experienced a medical emergency and was sent to the Labor & Delivery unit by Dr. Haughton.

111. While there and concerned about work, Plaintiff called into a Zoom meeting with Dr. Leung and emailed her to request time off as nurses were placing IVs into her body. Dr. Leung's response was to scold Plaintiff for not coming into work.

112. Dr Leung emailed Plaintiff saying, **"It would be appreciated if you could have let us know earlier that you were not coming to work today,"** even though Dr. Leung had told Plaintiff the day before that she should stay home and rest.

113. On July 20, 2020, Plaintiff sent Dr. Leung a letter from Dr. Haughton stating, **"Due to [Robin Warner's] medical condition at this time…she has been advised to begin bed rest as of 07/20/2020…excuse her absences for glucose stabilizing and fetal monitoring."**

114.   On or about July 20, 2020, Hospital for Special Surgery told Plaintiff that it could not find
       her employment agreement, which would have stated Plaintiff's number of contractual sick
       days.

115.   Dr. Leung alleged that Plaintiff had no paid sick days remaining. Human Resources then
       told Plaintiff that she in fact had at least nine remaining sick days and provided Family and
       Medical Leave Act (FMLA) Leave of Absence paperwork.

116.   Plaintiff continued to feel ill and took sick leave until July 29, 2020.

117.   On or about July 29, 2020, Plaintiff came into work for her last scheduled day of employment
       and was told by a staffer in the Graduate and Medical Education office that she had
       completed all of her requirements for graduation and "we will mail your diploma." Dr.
       Lange, Dr. Leung, and Human Resources also each independently confirmed to Plaintiff on
       this day that she had completed all terms of her employment and training.

**Retaliation: Defamation and False Allegations**

118.   Upon information and belief, on or about July 21, 2020, while Plaintiff was out on sick leave,
       Dr. Lange loudly demanded that Dr. Leung call Plaintiff into work. Dr. Leung replied, "**I
       can't do that. That's illegal.**" Dr. Lange, Dr. Leung, and the Neurology department office
       manager then met in an office on a conference call with others. Dr. Lange was trying to
       figure out how to require Plaintiff to come into work, despite her disability. An individual
       on the phone told Dr. Lange that he could not do that, and Dr. Lange became visibly angry.
       Dr. Lange then continued a tirade, complaining about Plaintiff's disability and sick leave,
       through the hallway.

119. That same day, on July 21, 2020, Dr. Lange lodged an internal complaint against Plaintiff with the Hospital of Special Surgery Corporate Compliance and Internal Audit Department ("Compliance Department") and Robbins for allegedly engaging in research misconduct.

120. Dr. Lange's complaint was made in bad faith. Dr. Lange would not have retaliated against Plaintiff and filed the complaint, but for, Plaintiff's disability and taking associated sick leave.

121. As Plaintiff's supervisors, Dr. Lange, Dr. Leung, and other supervisors were tasked with overseeing and ensuring that Plaintiff, a Fellow and novice researcher, had an understanding of proper research techniques and procedures.

122. Instead of providing guidance, Dr. Lange, Dr. Leung, and other supervisors were unresponsive to Plaintiff's questions about research procedure and excluded her from research meetings.

123. Plaintiff did not receive her diploma, despite graduating and meeting all requirements.

124. On or about July 30, 2020, Robbins emailed Plaintiff that **"there are questions regarding processes related to the [COVID-19 research manuscript]" that Plaintiff had submitted two months earlier.**

125. The following day, Robbins informed Plaintiff **that "we will be holding your diploma until the investigation is over."**

126. Having never previously heard any concerns about her research or research protocol, Plaintiff replied that the accusation appeared to be part of the ongoing discrimination and retaliation she had been experiencing: "**[Dr. Leung] is still trying to make trouble where none exists and it is harassing/retaliation for my request for pregnancy accommodations and for my disability leave."**

127. In this same email, Plaintiff informed Robbins, "**I unfortunately have been forced to retain a lawyer over this and will report to EEOC, etc.**"

128. Plaintiff was devastated and shocked by the accusation. Dr. Lange had previously praised this research at Plaintiff's May 15, 2020 presentation and Plaintiff had been in regular contact with her supervisors about her research, requesting direction and feedback along the way.

129. Additionally, on or about June 1, 2020, Plaintiff had sought clarification from Dr. Lange about certain research procedures, and noted in her submission application, "**I presented this as a grand rounds topic. Want to make sure I am going about this correctly.**"

130. Despite Plaintiff's repeated complaints that her diploma was being withheld in retaliation for making an accommodation request, Defendants failed to take any corrective action.

131. On September 16, 2020, Plaintiff spoke to the Compliance Department over the phone, and they stated to Plaintiff that they intended to close their investigation and that Plaintiff had broken no laws. Furthermore, the Compliance Department specifically instructed Plaintiff to take no further action to remediate potential concerns, as this was unnecessary.

132. Upon information and belief, on or about September 16, 2020, the Compliance Department communicated their findings exonerating Plaintiff to Dr. Lange.

133. On September 17, 2020, the American Neurological Association ("ANA") contacted Plaintiff to inform her that the ANA was withdrawing her research abstract from its publication (a different abstract from the one Hospital for Special Surgery was purportedly investigating) and canceling her upcoming presentation at its upcoming national conference.

134. The ANA is a leading organization for physicians and researchers specializing in neurological and neuromuscular medicine.

135. Even though the abstract and presentation were unrelated to the alleged research misconduct, Dr. Lange had contacted the ANA to further impugn Plaintiff's reputation and damage her career prospects.

136. The field in which Plaintiff practices is relatively small and insular, and Dr. Lange's defamatory statements carry great weight as he formerly served as the president of the New York State Neurological Society from 2011-2012.

137. Despite this, upon information and belief, multiple current and former employees at Hospital for Special Surgery have expressed concerns about Dr. Lange's honesty and ethics.

138. According to a Federal criminal court filing, "On September 17, 1998, the Government filed an indictment charging Lange with one count of insider trading in violation of 15 U.S.C. §§ 78ff(a) and 78j(b). Subsequently, the Government and Defendant entered into a written plea agreement pursuant to Rule 11 of the Federal Rules of Criminal Procedure." This was directly related to Dr. Lange's own research activities.

139. On or about July 25, 2022, Dr. Lange's employment at Hospital for Special Surgery ended.

140. Upon information and belief, Dr. Lange's departure from Hospital for Special Surgery was abrupt and unusual, with no successor Department Chairman in place. Several individuals speculated that Dr. Lange had been terminated or forced to retire by Hospital for Special Surgery.

141. Defendants have caused severe and permanent damage to Plaintiff's reputation. The false accusations of research misconduct will follow her, and she has been denied the second-year fellowship diploma that she rightly earned, affecting Plaintiff's career prospects in perpetuity.

**<u>Retaliation: Defamation and Interference with Employment Prospects</u>**

142.   The specialized field of Neurology is small and career success is dependent on one's reputation and recommendations.

143.   In furtherance of the campaign of retaliation, Plaintiff's superiors, Dr. Lange, and Dr. Leung, interfered with Plaintiff's employment prospects, by providing defamatory and false references.

144.   For instance, on March 12, 2020, Plaintiff asked Dr. Lange if he could provide a reference for a post-fellowship Neurologist position at Mount Sinai Union Square. Dr. Lange agreed.

145.   That day, Dr. Stephen Scelsa ("Dr. Scelsa") told Plaintiff that he would call Dr. Lange the next day to discuss Plaintiff's qualifications for the position.

146.   Plaintiff was excited as she was well-suited for the position and was a top prospect for it.

147.   Yet, several days later, Dr. Scelsa informed Plaintiff that he chose another candidate for the position.

148.   Shortly thereafter, when Plaintiff disappointedly informed Dr. Lange that she had not been selected for the position, Dr. Lange stated, in sum and substance, that he told Dr. Scelsa that **"[P]laintiff's interests were not aligned with the position."**

149.   Plaintiff was surprised and upset by Dr. Lange's explanation. The position was in Plaintiff's specialty area and Plaintiff had several conversations with Dr. Lange in which they discussed her fit and interest.

150.   As such, Plaintiff believes that Dr. Lange's comments were intended to damage her reputation and career prospects.

151.   In March 2020, Plaintiff also interviewed at Northwell North Shore University Hospital ("Northwell") in Manhasset, New York, for a Neuromuscular Specialist position.

152. Dr. Anthony Geraci, Director of Neuromuscular Medicine, ("Dr. Geraci") interviewed Plaintiff for the position and it went very well.

153. Dr. Geraci informed Plaintiff that he had been searching for a qualified candidate for over a year and that he was so happy that she was joining Northwell.

154. Dr. Geraci was impressed by Plaintiff's qualifications, and Plaintiff was able to successfully negotiate a salary increase.

155. Plaintiff engaged in extensive discussions with Dr. Geraci and Dinela Ortiz, VP Service Line, Neurology, ("Ortiz") about the position's academic duties.

156. On April 13, 2020, Ortiz called Plaintiff to officially offer her the Neuromuscular Specialist position at Northwell Manhasset.

157. On April 30, 2020, Plaintiff verbally accepted the position at Northwell and received an email from Ortiz memorializing Plaintiff's acceptance and her negotiated salary, plus a performance bonus.

158. On or about May 27, 2020, Plaintiff received a written employment agreement from Northwell.

159. On or about June 2, 2020, Plaintiff sent Northwell minor edits to the contract detailing the academic duties Plaintiff and Ortiz had previously agreed upon.

160. On or about June 9, 2020, Plaintiff informed Dr. Lange that she intended to accept the Northwell offer.

161. Dr. Lange informed Plaintiff that he knew the Chairman of Neurology at Northwell professionally and that he did not like him.

162. On June 12, 2020, Ortiz from Northwell called Plaintiff to rescind her offer.

163. Plaintiff asked for further elaboration, however, Ortiz refused to explain further.

164.  Plaintiff was crushed.  She had already accepted the offer and began putting plans in place, such as signing a rental agreement for a residence on Long Island.

165.  Despite not knowing what had gone wrong, Plaintiff attempted to salvage the situation. Plaintiff desperately insisted that she would take the contract "as is." Ortiz stated that it was too late before hanging up the phone.

166.  After Plaintiff told Dr. Lange that her offer had been rescinded, Dr. Lange laughed at her.

167.  Dr. Lange went on to tell Plaintiff, in sum and substance, that he believed the company had rescinded their offer due to her pregnancy and that she should sue.

168.  Upon information and belief, Plaintiff believes that Dr. Lange had provided a false and defamatory reference to Northwell in further retaliation related to her pregnancy and accommodation request.

**Retaliation for Filing an EEOC Charge of Discrimination**

169.  On August 18, 2020, Andrea Ansorge, VP, Corporate Compliance & Internal Audit, emailed Plaintiff, "**We are wrapping up our review [of Lange's internal complaint] and plan to close it out next week.**"

170.  On September 23, 2020, Plaintiff spoke with Ms. Ansorge by phone. Ms. Ansorge again **said they had already completed the investigations into Plaintiff** and that she would be hearing back soon.

171.  On September 24, 2020, Plaintiff emailed Shapiro setting out some of the harassment, adverse actions, and retaliation she had experienced during and after her time at Hospital for Special Surgery.

172.  In the email, Plaintiff detailed the irreparable damage to her career and pleaded with Shapiro for assistance:

As a result of Drs. Leung and Lange's actions, I have no diploma, no full time job, no full time job prospects, no help or response from the department, 3 of my 5 research projects I worked hard on at HSS destroyed, no abstract/lecture at ANA and feel completely abandoned and unprotected by HSS. I am afraid what more they will do to me and my career. I have continually expressed concerns that the complaints are retaliatory for my pregnancy disability, which is illegal. No one has addressed these concerns and instead, more actions are being taken against me by Dr. Lange. Employee relations offered to talk to me in 2 weeks, but I will give birth before then. I am disappointed because I generally enjoyed my time there and appreciate everything I learned. I should be enjoying my days before labor and relaxing, but instead I live in anxiety and cry often. With nowhere to turn, I was advised by a few people to try reaching out to you.

173. On September 25, 2020, Shapiro replied to Plaintiff, "I referred your concerns to the responsible parties within [Hospital for Special Surgery]. They will contact you for follow-up and will update me regarding their progress."

174. Plaintiff never received any follow-up as to whether an investigation was commenced or completed. However, the discrimination and retaliation continued unabated.

175. As President and CEO of Hospital for Special Surgery, Shapiro had an obligation to take Plaintiff's complaint seriously and address the ongoing illegal activity at the Hospital.

176. On several occasions between October 2020 and December 2020, one of Plaintiff's attorneys spoke with an attorney for Hospital for Special Surgery about Plaintiff's case, and her plans to possibly file a charge with the EEOC.

177. Other than the aforementioned communications, there were no substantive developments from October 2020 through January 1, 2021, relating to Hospital for Special Surgery's review of Dr. Lange's complaint or Plaintiff's discrimination allegations.

178. On January 2, 2021, Plaintiff filed a Charge of Discrimination with the EEOC.

179. On January 10, 2021, late at night on a Sunday, Dr. Lionel B. Ivashkiv, M.D., Chief Scientific Officer at Hospital for Special Surgery, wrote an email to Hospital for Special

Surgery's Research Leadership Council with the subject, "need approval to proceed with informal investigation - **time sensitive**."

180. Dr. Ivashkiv's request to open an investigation into Plaintiff's research was retaliatory and intended to cast doubt on Plaintiff's credibility and protect Hospital for Special Surgery from liability.

181. Less than two weeks after Plaintiff filed her Charge of Discrimination, Hospital for Special Surgery opened investigations into nearly every research project Plaintiff had been involved with during her two years at the Hospital, in retaliation for engaging in protected activity.

182. On or about January 12, 2021, Rosemarie Gagliardi ("Gagliardi"), Vice President, Research Administration, at Hospital for Special Surgery informed Plaintiff that **"Please note that we have begun an informal inquiry of certain allegations brought against you regarding potential violations of [Hospital for Special Surgery]'s research misconduct policy. The Research Leadership Council has designated Susan Goodman, M.D. to conduct the informal inquiry."**

183. Hospital for Special Surgery's Position Statement to the EEOC (as Respondent) dated March 17, 2021 ("Position Statement"), made under penalty of perjury, states, "The COVID Manuscript posted by Dr. Warner on Research Square contains at least two false statements."

184. Hospital for Special Surgery could not have known whether the COVID Manuscript contained false statements without performing an investigation.

185. As of the date Hospital for Special Surgery submitted the Position Statement, preliminary witness interviews into the matter had not yet concluded.

186. Hospital for Special Surgery's investigation into the COVID Manuscript was not completed until July 2022, over a year after submitting the Position Statement to the EEOC.

187. Hospital for Special Surgery prejudged the outcome of their "investigation"—and communicated their prejudged, desired outcome to the EEOC—in a gross violation of Plaintiff's due process rights.

188. Defendants have continued to harass and embarrass Plaintiff with false allegations of academic misconduct for over two years, in retaliation for complaining of pregnancy discrimination.

189. Defendants' conduct contravenes federal, state, and local law which prohibits employers from retaliating against employees who engage in protected activity, such as filing a complaint with the EEOC.

190. Defendants would not have retaliated against Plaintiff and opened an additional inquiry into her research, but for, Plaintiff's decision to file a Charge of Discrimination with the EEOC.

### Harm to Plaintiff

191. Defendants' discrimination, retaliation, and defamation against Plaintiff is ongoing as Plaintiff's physician licensing, employment verification, professional references, medical insurance contracts, professional society memberships, and background checks have all been adversely impacted.

192. Defendants' conduct left Plaintiff feeling humiliated offended, degraded, victimized, embarrassed, and depressed.

193. Defendants' failure to provide pregnancy accommodations left Plaintiff feeling extremely anxious and stressed.

194. The pregnancy discrimination that Plaintiff endured negatively affected her pregnancy both physically and emotionally, as Plaintiff was denied the pleasure of experiencing her first pregnancy unencumbered by unfair and illegal treatment.

195.   As a result of the discriminatory acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits, and other compensation which such employment entailed.

196.   Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

197.   Plaintiff's economic harm and emotional distress continues to accrue as she has not received her diploma and her career opportunities have been impeded.

198.   As a result of the above, Plaintiff has been damaged in an amount in excess of the jurisdiction of the Court.

199.   Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

200.   As such, Plaintiff demands punitive damages.

## AS A FIRST CAUSE OF ACTION
## DISCRIMINATION UNDER TITLE VII
## AGAINST DEFENDANT HOSPITAL FOR SPECIAL SURGERY

201.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

202.   Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e(2) provides that:

> It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to him compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, **sex**, or national origin…

203.   This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e *et seq*., for relief based upon the unlawful employment practices of the Defendants. Plaintiff complains of Defendants' violations of

Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's sex.

204.   Defendants violated the sections cited herein as set forth.

205.   Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e *et seq.*, by discriminating against Plaintiff because of her sex.

## AS A SECOND CAUSE OF ACTION
### DISCRIMINATION UNDER PDA
### AGAINST DEFENDANT HOSPITAL FOR SPECIAL SURGERY

206.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

207.   Title VII of the Civil Rights Act of 1964, as amended by the PDA, 42 U.S.C. § 2000e(k), provides, in pertinent part, that:

> **The terms "because of sex" or "on the basis of sex" include**, but are not limited to, because of or **on the basis of pregnancy,** childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 703(h) of this title [42 USCS § 2000e-2(h)] shall be interpreted to permit otherwise.

208.   Plaintiff complains of Defendants' violations of the PDA's prohibition against discrimination in employment based, in whole or in part, upon an employee's pregnancy.

209.   Defendants violated the sections cited herein as set forth.

210.   Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e *et seq.*, by denying Plaintiff reasonable workplace accommodations because of her pregnancy.

## AS A THIRD CAUSE OF ACTION
### FOR RETALIATION UNDER TITLE VII
### AGAINST DEFENDANT HOSPITAL FOR SPECIAL SURGERY

211.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

212.   Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> (1) to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

213.   Defendants engaged in unlawful employment practices prohibited by Title VII by discriminating and retaliating against Plaintiff because she complained of pregnancy discrimination, requested a pregnancy accommodation, and filed an EEOC Charge of Discrimination.

<div align="center">

**AS A FOURTH CAUSE OF ACTION**
**DISCRIMINATION UNDER THE NYSHRL**
**AGAINST DEFENDANTS**

</div>

214.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

215.   New York State Executive Law § Executive Law § 296 provides that,

> It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, **sex**, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

216.   Defendants engaged in unlawful discriminatory practices by denying Plaintiff a reasonable pregnancy accommodation, harassing her, and retaliating against her because of her pregnancy.

**AS A FIFTH CAUSE OF ACTION**
**RETALIATION UNDER THE NYSHRL**
**AGAINST DEFENDANTS**

217.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this

Complaint.

218.   New York State Executive Law § 296(1)(e) provides that, "It shall be an unlawful

discriminatory practice for any person engaged in any activity to which this section applies

to retaliate or discriminate against any person because he or she has filed a complaint,

testified, or assisted in any proceeding under this article."

219.   Defendants engaged in unlawful employment practices prohibited by discriminating and

retaliating against Plaintiff because she complained of pregnancy discrimination, requested

a pregnancy accommodation and filed a Charge of Discrimination with the EEOC.

**AS A SIXTH CAUSE OF ACTION**
**AIDING AND ABETTING UNDER THE NYSHRL**
**AGAINST DEFENDANT DR. LANGE**

220.   Plaintiff repeats, reiterates, and realleges each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

221.   New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory

practice:

> "For any person to aid, abet, incite compel or coerce the doing of any acts
> forbidden under this article, or attempt to do so."

222.   Defendant Dr. Lange engaged in an unlawful discriminatory practice in violation of New

York State Executive Law §296(6) by aiding, abetting, inciting, compelling, and coercing

the discriminatory conduct.

**AS A SEVENTH CAUSE OF ACTION**
**AIDING AND ABETTING UNDER THE NYSHRL**
**AGAINST DEFENDANT SHAPIRO**

223. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

224. New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice:

> "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

225. Defendant Shapiro engaged in an unlawful discriminatory practice in violation of New York State Executive Law §296(6) by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct.

<div align="center">

**AS AN EIGHTH CAUSE OF ACTION**
**DISCRIMINATION UNDER THE NYCHRL**
**AGAINST DEFENDANTS**

</div>

226. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

227. The New York City Administrative Code § 8-107(1) provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, **gender**, disability, marital status, partnership status, caregiver status, sexual orientation, uniformed service, or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or **to discriminate against such person in compensation or in terms, conditions or privileges of employment.**

228. The New York City Administrative Code § 8-107(22)(a) also provides that:

> **It shall be an unlawful discriminatory practice for an employer to refuse to provide a reasonable accommodation**, as defined in section 8-102, **to the needs of an employee for the employee's pregnancy**, childbirth, or related medical condition that will allow the employee to perform the essential requisites of the job, provided that such employee's pregnancy, childbirth, or related medical condition is known or should have been known by the employer.

229. The New York City Administrative Code § 8-107(28)(a) also provides that:

**It shall be an unlawful discriminatory practice for an employer**, labor organization or employment agency or an employee or agent thereof **to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a person who has requested an accommodation** or who the covered entity has notice may require such an accommodation… **[r]elated to pregnancy, childbirth or a related medical condition** as provided in subdivision 22 of this section.

230. Furthermore, under the NYCHRL an employer must accommodate a pregnant employee in her current position, consider accommodations in comparable positions, and only **"as a last resort, when no other accommodation can be made, an unpaid leave of absence may be offered as a temporary accommodation."** www1.nyc.gov/site/cchr/law/pregnancy-legal-guidance.page

231. Defendants engaged in unlawful discriminatory practices in violation of New York City Administrative Code §8-107(1)(a) by denying Plaintiff a pregnancy accommodation, failing to engage in an interactive process, discriminating against her and harassing her because of her pregnancy.

<u>**AS A NINTH CAUSE OF ACTION**</u>
**RETALIATION UNDER THE NYCHRL**
**AGAINST DEFENDANTS**

232. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

233. The New York City Administrative Code § 8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

234. Defendants engaged in unlawful discriminatory practices in violation of New York City Administrative Code § 8-107(7) by retaliating against Plaintiff because she complained of pregnancy discrimination, requested a pregnancy accommodation, and filed a Charge of Discrimination with the EEOC.

## AS A TENTH CAUSE OF ACTION
### AIDING AND ABETTING UNDER THE NYCHRL
### AGAINST DEFENDANT DR. LANGE

235. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

236. The New York City Administrative Code Title 8-107(6) provides that it shall be an unlawful discriminatory practice, "For any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this chapter, or attempt to do so."

237. Defendant Dr. Lange engaged in an unlawful discriminatory practice by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

## AS A ELEVENTH CAUSE OF ACTION
### AIDING AND ABETTING UNDER THE NYCHRL
### AGAINST DEFENDANT SHAPIRO

238. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

239. The New York City Administrative Code Title 8-107(6) provides that it shall be an unlawful discriminatory practice, "For any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this chapter, or attempt to do so."

240. Defendant Shapiro engaged in an unlawful discriminatory practice by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

## AS A TWELFTH CAUSE OF ACTION
### DEFAMATION UNDER NEW YORK COMMON LAW
### AGAINST DEFENDANT DR. LANGE

241. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

242. Defendant Dr. Lange defamed Plaintiff by falsely publishing accusations that Plaintiff engaged in academic misconduct to third parties, despite entertaining serious doubts as to the veracity of the claims.

243. These comments were defamatory per se, as the comments questioned Dr. Warner's fitness for her profession, alleged she engaged in academic misconduct, and led prospective employers to revoke their job offers or withdraw consideration of Plaintiff's applications.

244. Dr. Warner was harmed by these defamatory statements when she had job offers rescinded and her professional credibility destroyed.

245. The subsequent unjustified investigations will forever interfere with and limit Dr. Warner's career and reputation.

246. As a result of said conduct, Plaintiff continues to suffer severe emotional distress, reputational harm, and loss of career and academic opportunities.

247. Defendant Dr. Lange is therefore liable to Plaintiff for defamation per se for damages in an amount to be determined at trial.

## AS A TWELFTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH BUSINESS UNDER NEW YORK COMMON LAW AGAINST DEFENDANT DR. LANGE

248. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

249. Defendant Dr. Lange has intentionally interfered with and continued to intentionally interfere with and disrupt Plaintiff's prospective employment opportunities following the end of Plaintiff's Fellowship.

250. Lange knew of Dr. Warner's job interview at Mount Sinai and proposed contract with third-party Northwell when he intentionally provided a bad job reference or information meant to derail her candidacy.

251. As a result of Defendants' intentional and wrongful actions, negotiations for Plaintiff's prospective employment have been terminated and withdrawn, which entitle Plaintiff to the maximum allowable damages under this statute and an award of punitive damages.

## JURY DEMAND

252. Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.  Declaring that Defendants engaged in unlawful employment practices prohibited by the Title VII, the NYSHRL, and the NYCHRL, in that Defendants discriminated and retaliated against Plaintiff on the basis of her pregnancy:

B.  Declaring that Defendant Dr. Lange is liable for defamation per se and tortious interference with business under the New York Common Law;

C.  Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and retaliation and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

D.  Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

E.  Awarding Plaintiff punitive damages;

F.  Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action;

G.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just and

proper to remedy the Defendants' unlawful employment practices.

Dated:  New York, New York
        December 8, 2022

<div style="margin-left: 40%;">

**PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC**

By: _____

Michelle A. Caiola, Esq.
Jonathan Goldhirsch, Esq.
Phillips & Associates, PLLC
*Attorneys for the Plaintiff*
45 Broadway, Suite 430
New York, New York 10006
T: (212) 248 – 7431
F: (212) 901 – 2107
mcaiola@tpglaws.com

</div>